IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

AUG 02 2022

JULIA C. DUDLEY, CLERK
BY: s/ H. MCDONALD
DEPUTY CLERK

| | |
|---|---|
| CARL T. NORTON, NORHURST PROPERTIES DANVILLE, LLC, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) 4:21-CV-00039 ) ) |
| WILKINS & CO. REALTY, INC., JAMES BUCKNER, EDWARD B. WALKER, RE PROSPECTS, LLC, and 2291 SCHOOLFIELD, LLC, | ) ) ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.[1]

This is an action alleging improprieties in the listing and sale of commercial property in Danville, Virginia. Before the court are various motions to dismiss filed by all Defendants pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Docs. 28, 30, 32.) Plaintiffs have responded in opposition. (Docs. 40, 41, 42.) Argument was heard on December 17, 2021, before the undersigned was appointed on June 6, 2022. (Docs. 47, 48.) The court has reviewed the complete record, including the transcript of the oral argument. For the reasons set forth below, the Defendants' motions to dismiss will be granted.

---

[1] Chief Judge, United States District Court for the Middle District of North Carolina, assigned by the Chief Judge of the Fourth Circuit pursuant to 28 U.S.C. § 292(b). (Doc. 48.)

I.    **BACKGROUND**

The facts, as alleged in the amended complaint and taken as true in the light most favorable to Plaintiffs, generally reveal the following:

In September 2012, Plaintiff Carl T. Norton acquired 38 acres of wooded land in Danville, Virginia (the "Property"). (Doc. 36 at ¶¶ 13, 14.)  The Property included a large commercial office space, which made the site useful as either an institutional or corporate headquarters. (Id. at ¶ 14.)  In October, Norton transferred the Property to Plaintiff Norhurst Properties Danville, LLC ("Norhurst"), a Virginia limited liability company of which Norton is the sole member. (Id. at ¶¶ 2, 15, 16.)  On August 4, 2018, Norhurst and Defendant Wilkins & Co. Realty, Inc. ("Wilkins Realty"), entered into a listing agreement (the "Listing Agreement") to sell the Property. (Id. at ¶ 17.)  The Listing Agreement set the price at $1,295,000. (Id. at ¶ 19.)  Norton notified Hampton Wilkins, president of Wilkins Realty, that Norhurst was involved in litigation with Dan River Plaza, LLC over a water supply line and a shared easement between the company's property and Norhurst's Property. (Id. at ¶ 21.)

In May 2019, Wilkins Realty, via Wilkins, notified Norton that the Danville Police Department ("DPD") expressed interest in purchasing the Property as its new headquarters. (Id. at ¶ 23.)  Shortly thereafter, DPD officers, including the deputy chief,

2

visited the Property.  (Id. at ¶ 24.)  One month later, the DPD chief of police as well as six uniformed officers visited the Property.  (Id. at ¶ 25.)  Following this second visit, Norhurst proposed a "lease to purchase" plan to DPD, which provided for a five-year lease at an annual cost of $145,200, with the option of purchasing the Property for $1,450,000 at the lease end.  (Id. at ¶ 26.)  The lease plan also allowed the City of Danville (the "City") to make any improvements or renovations.  (Id. at ¶ 27.)  The lease proposal was relayed to members of the Danville City Council ("City Council") in June 2019, and Wilkins met with the DPD police chief and "all of the leadership" on June 27 to discuss the proposal.  (Id. at ¶¶ 28, 29.)  One week prior to this meeting, Norton observed three individuals inside and two individuals outside the Property without his permission.  (Id. at ¶ 30.)  When Norton confronted the alleged trespassers, they informed him that they were from the DPD and were there to look at the Property.  (Id. at ¶ 31.)  Norton informed the individuals that they were there without authorization, the Property had confidential client information on site, and they should not have entered.  (Id.)  Norton informed Wilkins of the incident, and Wilkins responded that he was unsure how the individuals accessed the Property as only Wilkins Realty had a key.  (Id. at ¶ 32.)

On July 1, four days after Wilkins met with the DPD police chief to discuss the lease proposal, Wilkins contacted Norton and

informed him that DPD was no longer interested in the Property. (Id. at ¶ 33.)  This development came as a surprise to Wilkins and Norton, as the parties had engaged in positive negotiations, the DPD had made multiple visits to the Property, and the Property "seemed an ideal site for a police headquarters." (Id.)  Without DPD as a potential buyer, Norton "was left with few options to sell the Property." (Id. at ¶ 34.)

However, the next day, Wilkins sent a text message to Norton explaining that there was a new potential purchaser. (Id. at ¶ 35.)  Defendant James Buckner, an agent with Wilkins Realty and a member of the City Council, had a client who wanted to view the Property but who wanted to remain confidential. (Id.)  Later that day, Norton, Buckner, and Wilkins had lunch to discuss the Property and Buckner's potential buyer. (Id. at ¶ 38.)  At that meeting, Buckner represented that his buyer was "a large corporation potentially relocating to Danville and seeking a new corporate headquarters." (Id. at ¶ 39.)  According to Buckner, the potential buyer was negotiating directly with the City and, therefore, needed to remain anonymous until the City formally announced its arrival. (Id.)  Buckner required Norton to sign a non-disclosure agreement, which provided that Norton would neither inquire further about the anonymous buyer nor discuss any details regarding the buyer's potential purchase of the Property. (Id. at ¶ 40.)  Norton did so. (Id.)

Buckner agreed to recommend that his client offer a price that would pay off the outstanding mortgage on the Property. (Id. at ¶ 42.)  Thereafter, Norton and Buckner began negotiating a deal for Buckner's client to purchase the Property. (Id. at ¶ 43.)  On July 8, Buckner conveyed his client's initial offer of $800,000 for the Property. (Id. at ¶ 44.)  Norton countered, noting that the purchase price should cover the balance of the outstanding mortgage on the Property, which was approximately $1 million. (Id. at ¶ 45.)  Two days later, Buckner sent a text message to Norton stating "925k is looking like there [sic] final offer they don't see how to justify paying more given what they are facing.  They also have some other good options in central [Virginia]." (Id. at ¶ 46.)

Nevertheless, on July 15, Buckner forwarded an unsigned sales contract (the "Purchase Agreement") from an entity identified as RE Prospects, LLC ("RE Prospects") for $1,037,740.[2] (Id. at ¶ 49.)  Norhurst signed the agreement the same day. (Id. at ¶ 50.)  Later that day, Buckner told Norton that his out-of-town corporate client needed to visit the Property. (Id. at ¶¶ 52, 53.)  After this visit, on July 17, Buckner's client ratified the Purchase Agreement on behalf of Defendant RE Prospects. (Id. at ¶ 54.)  Buckner

---

[2] Defendant RE Prospects was allegedly formed in Delaware on July 8, 2019, the same day Buckner conveyed an initial offer of $800,000. (Doc. 36 at ¶ 44 n.2.)

received the keys to the Property the same day and had exclusive access to it for the next four months. (Id. at ¶ 55.)

The ten-page Purchase Agreement includes standard terms for the sale of commercial property, including a "No Litigation" clause, which provides:

> As of Settlement, there shall be no litigation, proceeding or investigation pending, or to the knowledge of Purchaser or Seller threatened, which might prevent or adversely affect the intended use of the Property or which questions the validity of any action taken or to be taken by Seller or Purchaser hereunder, or which threatens the continued operation of the Property for commercial purposes.

(Doc. 36-5 at 3.) Additionally, the Purchase Agreement included an assignment clause, which the parties expressly negotiated so that the Purchase Agreement could "be assigned by one party without the written consent of the other party." (Id. at 6.)

The Purchase Agreement also had a thirty-day feasibility period during which the purchaser and its agents and contractors had "the right to (i) enter the Property for the purpose of inspecting the Property and performing tests as are desirable to Purchaser in its sole and absolute discretion." (Doc. 36 at ¶ 56; Doc. 36-5 at 2.) On August 1, Buckner asked Norton for an additional key as his client was not able to access a locked door on the Property. (Doc. 36 at ¶ 61.) Because of this delay, Buckner requested a two-week extension to close the Purchase Agreement, to which Norton agreed. (Id. at ¶¶ 62, 64.) On August

26, Norton and RE Prospects entered into an addendum to the Purchase Agreement, extending the closing date to October 31. (<u>Id.</u> at ¶ 64.)  At some point thereafter, RE Prospects assigned its rights to Defendant 2291 Schoolfield, LLC ("Schoolfield").[3] (<u>Id.</u> at ¶ 65.)

On October 3, Schoolfield sent Norton a notice of default under the Purchase Agreement. (<u>Id.</u> at ¶ 66.)  Schoolfield based this notice on the ongoing litigation between Norhurst and Dan River Plaza over a water supply line and shared easement, which Norton had previously disclosed to Wilkins Realty. (<u>Id.</u>)  As a result of the alleged default, Schoolfield demanded the purchase price be reduced by $50,000. (<u>Id.</u> at ¶ 67.)  On November 3, the sale of the Property closed with a final purchase price of $987,740. (<u>Id.</u> at ¶ 70.)

Ten months later, on September 24, 2020, a Danville newspaper reported that the City Council and the DPD met at the Property to reveal the Property as the new headquarters for the DPD. (<u>Id.</u> at ¶ 72.)  According to the newspaper, the project was estimated at $17.7 million, which included an annual lease payment of $965,000 for seven years. (<u>Id.</u> at ¶ 73.)  The lease payment would then be reduced to $720,000 per year beginning on the eighth year. (<u>Id.</u> at ¶ 73 n.4.)  When the lease expired, title would not transfer to

---

[3] Schoolfield was allegedly formed in Virginia on September 11, 2019. (Doc. 36 at ¶ 109.)

the DPD; the developer would retain control of "critical portions of the Property," including the existing office building as well as two additional commercial lots. (Id. at ¶ 74.)  The deal called for the City to own "those portions of the Property that are essentially non-developable, thus shielding the developer from property taxes." (Id. at ¶ 75.)  Norton then realized that the anonymous, out-of-town corporate client who purchased the Property was not a corporation relocating to the City, but rather a single-asset development entity, which intended to purchase the Property from Norhurst and then lease it to the DPD. (Id. at ¶ 76.) Plaintiffs allege that the deal between the developer-purchaser and the DPD was similar in structure to that previously offered by Norton. (Id.)[4]

Roughly two months later, in November 2020, Norton's counsel submitted a Freedom of Information Act request to the City, specifically seeking communications about the new DPD headquarters between the City and its employees and any third parties. (Id. at ¶ 80.)  Based on the City's response, Norton realized that Defendant Edward Walker, a real estate developer and investor and

_____

[4] This vague, conclusory allegation is patently unsupported by the factual allegations of the amended complaint and thus need not be accepted as true at this stage.  United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979).  The proposals were similar only in the sense that both involved a lease arrangement.  Watkins's proposal (which had a substantially higher lease cost) involved Schoolfield making millions of dollars of improvements on the Property that Norhurst's proposal did not.

close acquaintance of Buckner, was the anonymous buyer of the Property and unidentified principal behind RE Prospects. (Id. at ¶ 81.)   Norton also learned that Walker had approached Norhurst via Buckner, negotiated the price of the Property to below asking price, and, "while under the [Purchase Agreement]," marketed to and negotiated with the City about a future lease-purchase of the Property.[5] (Id.)

Specifically, Norton learned:

- Beginning the first week of July 2019, around the same time that Wilkins informed Norton that DPD was no longer interested in the Property, Walker engaged in direct communications about the Property with Corrie Bobe, the City's director of economic development, and Ken Larking, the city manager. (Id. at ¶ 83.)

- On July 5, 2019, four days after negotiations between Norhurst and DPD ended, Walker sent a text message to Bobe explaining, "I walked [the Property] today . . . I'm wondering if there's an opp[ortunity] for us to work on it together . . . Would be nice for [Economic Development] and Ed to get control over it." (Id. at

---

[5] Plaintiffs allege Walker's actions occurred "while under the [Purchase Agreement]" to portray Walker's subsequent negotiations with the City as nefarious.  However, it is unclear how negotiations with a third party would run afoul of the Purchase Agreement.

¶ 84.)   On July 23, after RE Prospects signed the
Purchase Agreement with Norhurst but unbeknownst to
Norhurst, Walker gave Bobe a set of keys to the Property[6]
so that the City economic development team could visit
the Property at its convenience.  (Id. at ¶ 85.)   Over
the following three months, Walker and the City worked
together to develop a vision for the Property and acquire
it from Norhurst.  (Id. at ¶ 86.)

- Around August 5, 2019, Bobe informed Walker that she had
  spoken with the City Attorney and the chairman of the
  City's industrial development authority, and they had
  "given [Walker's] team the green light to begin working
  on the [Property]."  (Id. at ¶ 90.)   Bobe also inquired
  whether Walker had "formed the LLC for the purchase of
  [the Property]."  (Id.)   On August 28, two days after
  Norhurst and RE Prospects entered the addendum to extend

---

[6] The Purchase Agreement includes an "Access/Cooperation" clause which
provides: "Purchaser and his duly authorized agents shall be entitled
to reasonable access to the Property for the purpose of surveying,
appraising and making other findings related to the Property."   (Doc.
36-5 at ¶ 10.)   Virginia law states that the buyer has access to property
upon signing of a purchase agreement.   See Dominion Bank, N.A. v. Wilson,
867 F.2d 203, 205 (4th Cir. 1989) ("Under Virginia law, it is well-
established that a contract for the purchase of land . . . vests in the
purchaser an equitable interest in real estate"); 1 Tiffany Real Prop.
§ 307 (3d ed. 2021) ("[O]n the making of an executory contract for land,
of which specific performance would be decreed, a court of equity . . .
will consider the purchaser as the owner of the land," and "[o]n transfer
of his interest by the vendor, all that passes to the transferee is the
right to demand and receive the balance of the purchase price.").

the Purchase Agreement, Bobe arranged for a tour of the
Property with the DPD chief of police, the city manager,
and the "PW director." (Id. at ¶ 93.)  Nearly a month
later, after RE Prospects had assigned its rights under
the Purchase Agreement to Schoolfield and as
negotiations between Schoolfield and Norhurst about the
waterline issue and eventual amendment to the Purchase
Agreement were becoming more involved, Walker sent a
text to Bobe asking, "is there someone at the City -
[K]en [Larking, the city manager] or the water people
that can help [Walker's attorney] understand whats [sic]
up at [the Property] re the water/sinkhole issue?" (Id.
at ¶ 95.)  The "water/sinkhole issue" related to the
ongoing conflict between Norton and Dan River Plaza over
a water line and shared easement.

- Bobe responded on October 1, 2019, a month before the
closing date for the Property, informing Walker that the
issue related to "a bit of a back and forth between
Norton and the Fire Marshall [sic] regarding the need
for installation of fire hydrants." (Id. at ¶ 96.)  Bobe
then provided a list of City officials who could provide
additional information as to the water line issue --
information that was later used by Walker through
Schoolfield as the basis for the $50,000 reduction in

purchase price.   (Id. at ¶¶ 97, 100.)   Walker then advised the city manager that "simplest resolution" to the City's ongoing dispute with Norhurst over the water line was to have Norhurst relocate the water line on its Property, and, according to Plaintiffs, Walker did so in order to ask the city manager to "use his position to force Norhurst and [] Norton to make certain improvements to the Property." (Id. at ¶¶ 100, 101). The City then informed Norton that to be eligible for an occupancy permit, which was required by the Purchase Agreement, he needed to relocate the water line onto the Property. (Id. at ¶ 101.)

- On June 15, 2020, Schoolfield, as the new owner of the Property, submitted a formal response to the City's request for proposals for construction of a new police headquarters. (Id. at ¶ 113.) Schoolfield represented (falsely, Plaintiffs charge) several things. Schoolfield stated that "[t]here has never been any discussion with [] Buckner about the Danville Police Department or any other municipality-based use of [the Property]." (Id. at ¶ 114.) Additionally, Schoolfield disclosed that the Property "was originally purchased with the intention to either be a private sector commercial office redevelopment, a medical office

redevelopment, or a condominium, apartment or hotel site." (<u>Id.</u>) Schoolfield concluded its proposal by stating, "[t]here was no knowledge at the time of the acquisition of any interest on the part of the Danville Police Department." (<u>Id.</u>) Schoolfield's proposal was selected by the City, which did not interview any other respondent to its request for proposals. (<u>Id.</u> at ¶¶ 120, 121.)

- On October 8, 2020, the City approved the lease agreement and sales agreement for the Property with Schoolfield. (<u>Id.</u> at ¶ 122.)

Plaintiffs filed this lawsuit on September 13, 2021, bringing five claims. (Doc. 1.) Count I seeks rescission of the Purchase Agreement between Norhurst and Schoolfield on the ground that Buckner's allegedly false representations that RE Prospects was an out-of-state corporation seeking to relocate its headquarters in the City induced Norhurst to sell the Property at a discounted rate. (Doc. 36 at ¶¶ 124-132.) Count II alleges that Wilkins Realty and Buckner breached fiduciary duties owed to Norton and Norhurst as sellers of the Property. (<u>Id.</u> at ¶¶ 133-146.) Count III alleges that Buckner committed fraud when he understood, given his position on the City Council, that Walker was in conversations with the City to develop the Property as a new police headquarters but represented to Norhurst that Walker was an out-of-town

13

corporate client.  (Id. at ¶¶ 147-158.)  Count IV alleges that
Walker, RE Prospects, and Schoolfield engaged in fraud when they
hired Buckner with the intention of deceiving Norhurst into
believing that a corporate client wanted to relocate to the City.
(Id. at ¶¶ 159-165.)  Finally, Count V alleges that all Defendants
engaged in a civil and statutory conspiracy to maliciously injure
Norhurst's business.  (Id. at ¶¶ 166-185.)  Each Defendant has
moved to dismiss the complaint for failure to state a claim upon
which relief can be granted pursuant to Rule 12(b)(6).  (Doc. 28,
30, 32.)

## II.  ANALYSIS

### A.  Jurisdiction and Standard of Review

This court has jurisdiction over Plaintiffs' claims, as the
parties are diverse and the amount in controversy exceeds $75,000.[7]
See 28 U.S.C. § 1332.  Under Federal Rule of Civil Procedure
12(b)(6), "a complaint must contain sufficient factual matter . .
. to 'state a claim to relief that is plausible on its face.'"
Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl.
Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is plausible
"when the plaintiff pleads factual content that allows the court
to draw the reasonable inference that the defendant is liable for

---

[7] The citizenship of the LLCs is determined by the citizenship of their
members, not their place of incorporation.  Gen. Tech. Applications,
Inc. v. Exro Ltda, 388 F.3d 114, 121 (4th Cir. 2004).

the misconduct alleged."[8]   Id.   In considering a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint," Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam), and all reasonable inferences must be drawn in the plaintiff's favor, Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997).  "Rule 12(b)(6) protects against meritless litigation by requiring sufficient factual allegations 'to raise a right to relief above the speculative level' so as to 'nudge[] the[] claims across the line from conceivable to plausible.'" Sauers v. Winston-Salem/Forsyth Cty. Bd. of Educ., 179 F. Supp. 3d 544, 550 (M.D.N.C. 2016) (quoting Twombly, 550 U.S. at 555).  Mere legal conclusions are not accepted as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Iqbal, 556 U.S. at 678. Where a complaint attaches or specifically refers to documents, as here, those may be considered without converting the motion into one for summary judgment.  Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 165–66 (4th Cir. 2016).

Additionally, as to Plaintiffs' claims of fraud and civil conspiracy, Federal Rule of Civil Procedure 9 imposes a higher

---

[8] Plaintiffs' statement that a motion to dismiss cannot be granted "unless it appears certain that the plaintiff can prove no set of facts which would supports its claim and would entitled it to relief" (Doc. 40 at 7) conjures up a prior standard disavowed by Twombly.  Twombly, 550 U.S. at 563 (noting that the "no set of facts" language "has earned its retirement" and "is best forgotten as an incomplete, negative gloss on an accepted pleading standard").

pleading standard whereby "a party must state with particularity the circumstances constituting fraud."   Fed. R. Civ. P. 9(b). "[L]ack of compliance with Rule 9(b)'s pleading requirements is treated as a failure to state a claim under Rule 12(b)(6)." Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 783 n.5 (4th Cir. 1999).

The parties agree that Virginia law applies.

**B.   Buckner's Motion to Dismiss**

Buckner moves to dismiss Plaintiffs' claims, arguing that Norton lacks standing to file suit, Plaintiffs fail to allege Buckner owed a fiduciary duty to them, and Plaintiffs fail to plausibly allege that his representations of his client were false or material.   (Doc. 28; Doc. 29.)   Plaintiffs have responded in opposition.   (Doc. 42.)

**1.   Norton's standing**

Buckner argues that Norton lacks standing because, while Norton is the sole principal of Norhurst, he is not a party to the Purchase Agreement.   (Doc. 29 at 4.)   Plaintiffs contend Norton has standing as a third-party beneficiary of the Purchase Agreement.   (Doc. 42 at 2.)

Standing is a threshold jurisdictional requirement and can be raised by any party or *sua sponte* by the court at any time.   See Plyler v. Moore, 129 F.3d 728, 731 n.6 (4th Cir. 1997) (holding that issues regarding subject-matter jurisdiction "may be raised

at any time by either party or *sua sponte* by this court"). Whether a party has standing to maintain an action in federal court is a question of federal, not state, law. Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 804 (1985) (holding that "[s]tanding to sue in any Article III court is, of course, a federal question which does not depend on the party's prior standing in state court"). To meet that requirement, Norton must sufficiently allege that he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016). "The party invoking federal jurisdiction bears the burden of establishing these elements." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). "When a complaint is evaluated at the pleading stage, however, 'general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the Court] presume[s] that general allegations embrace those specific facts that are necessary to support the claim.'" Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc., 892 F.3d 613, 620 (4th Cir. 2018) (quoting Lujan 504 U.S. at 561).

Norton contends he was the intended third-party beneficiary of the Purchase Agreement where a breach of that agreement would constitute an injury to him. "At common law, 'the general rule was that . . . [a breach of contract] action must be brought in

the name of the party in whom the legal interest was vested, and that this legal interest was vested in the person to whom the promise was made'" -- that is, the contracting party.  Thorsen v. Richmond Soc'y for the Prevention of Cruelty to Animals, 786 S.E.2d 453 (Va. 2016) (quoting Thacker v. Hubard, 94 S.E. 929, 931 (Va. 1918)).  Courts have found third-party standing to sue on the contract where the contract evinces a "clear intent to benefit [a] third person."  Valley Landscape Co., Inc. v. Rolland, 237 S.E.2d 120, 122 (Va. 1977).

Courts in Virginia "have narrowly interpreted the standard for an intended beneficiary."  Radosevic v. Va. Intermont Coll., 651 F. Supp. 1037, 1039 (W.D. Va. 1987).  The basic rule is that "a third-party beneficiary [must] show that an agreement is clearly and definitely intended to bestow a direct benefit on him before he has standing to sue."  Obenshain v. Halliday, 504 F. Supp. 946, 956 (E.D. Va. 1980) (citing Richmond Shopping Ctr., Inc. v. Wiley N. Jackson Co., 255 S.E.2d 518 (Va. 1979)).  In determining whether a third party is an intended beneficiary, courts look to "the four corners of the contract" to discern if there is "language which shows clear and definite intent to benefit her in a manner which would grant her standing to sue."  Id.

The Purchase Agreement appears to be a standard form agreement created by the Virginia REALTORS® association.  Norhurst is listed as "Seller," and RE Prospects is listed as "Purchaser."  (Doc. 36-

5 at 1.)   The parties also acknowledged that "WILKINS & CO. REALTORS – HAMPTON WILKINS" would serve as the "Listing Broker" representing Norhurst and that "WILKINS & COMPANY JAMES BUCKNER" was the "Selling Broker" representing the purchaser.   (Id.) Norton's name appears twice in the Purchase Agreement.   He is designated as the seller's recipient for any notices, requests, or demands (id. at 5), and he signed the Purchase Agreement on behalf of Norhurst as president of the limited liability company (id. at 8).

In no other place in the Purchase Agreement is Norton mentioned.   The four corners of the document do not establish Norton as a "clearly and definitely intended beneficiary." Rastek Constr. & Dev. Corp. v. Gen. Land Commer. Real Estate Co., LLC, 806 S.E.2d 740, 744 (Va. 2017) (quoting Thorsen, 786 S.E.2d at 462).   According to Norton, however, the facts alleged establish that he was "the sole intended beneficiary" because he was the sole principal of Norhurst, controlled all business operations and received all profits of Norhurst, and all parties "knew that Norton was the sole beneficiary." (Doc. 42 at 3.)   Such arguments do not establish his standing.

At best, Norton was an "incidental" beneficiary who was "far removed from the obligations assumed by the contracting parties," and not an intended beneficiary who is "such an integral part of the obligations" to establish standing.   Hixson v. Hutcheson, No.

19

5:17-CV-032, 2017 WL 2651718, at *3 (W.D. Va. June 19, 2017) (quoting Radosevic, 651 F. Supp. at 1038). The Purchase Agreement required nothing of Norton and similarly promised nothing to him. Thus, despite his contention otherwise, the only "sole intended beneficiar[ies]" to the Purchase Agreement are Norhurst and RE Prospects. (Doc. 42 at 3.) Norton's signature on behalf of Norhurst and his handling of Norhurst's business operations reflect his status as Norhurst's president and agent and similarly do not qualify him as an intended third-party beneficiary. Acting in this capacity, Norton "gave up standing to claim damages to the LLC, even if [he] also suffered personal damages as a consequence" of a breach. Painter's Mille Grille, LLC v. Brown, 716 F.3d 342, 348 (4th Cir. 2013) (citing Domino's Pizza, Inc. v. McDonald, 546 U.S. 470 (2006)).

Because there is no evidence within the four corners of the Purchase Agreement that the parties intended Norton to be a third-party beneficiary, he does not have standing to sue. Buckner's motion to dismiss as to Norton will be granted.

### 2. Breach of fiduciary duty claim

Norhurst's second claim alleges Buckner breached fiduciary duties owed to Norhurst by representing RE Prospects to be a large anonymous out-of-town corporation seeking to relocate its headquarters to the City. (Doc. 36 at ¶ 137.) Buckner moves to dismiss this claim, arguing that Norhurst has not alleged any facts

20

to establish the existence a fiduciary duty between Buckner, the purchaser's representative, and Norhurst, the seller. (Doc. 29 at 7-8.) Norhurst argues that Buckner, as an agent of Wilkins Realty, owed Norhurst a fiduciary duty because Wilkins Realty was also Norhurst's broker for the Purchase Agreement. (Doc. 42 at 4.)

A breach of fiduciary duty claim under Virginia law "must allege enough facts to prove the existence of a fiduciary duty, (2) the breach of that duty, and (3) resulting damages." Broadhead v. Watterson, No. 5:15-cv-00020, 2016 WL 742127, at *6 (W.D. Va. Feb. 24, 2016) (citing Carstensen v. Chrisland Corp., 442 S.E.2d 660, 666-67 (Va. 1994)). "An agent is a fiduciary with respect to the matters within the scope of his agency." H-B Ltd. P'ship v. Wimmer, 257 S.E.2d 770, 773 (Va. 1979). As a fiduciary, "a broker owes his principal the duty to use utmost fidelity to him and must disclose to him all facts within the broker's knowledge which may be material to the transaction, or which might influence the principal in deciding upon a course of action." Burruss v. Green Auction & Realty Co., 319 S.E.2d 725, 727 (Va. 1984).

A broker's duty is owed "at all times" to "his principal." Va. Real Estate Comm'n v. Bias, 308 S.E.2d 123, 125 (Va. 1983). Virginia Code § 54.1-2144 provides that "[t]he common law of agency relative to brokerage relationships in real estate transactions to the extent inconsistent with this article shall be expressly abrogated." As a consequence, all "the duties between a real

estate professional and a client are defined by the Code of Virginia and incorporated into each contractual relationship." Foster v. Wintergreen Real Estate Co, No. CL09000086, 2010 WL 11020447, at *3 (Va. Cir. Ct. Nov. 16, 2010) (amended upon reconsideration of other grounds).  Licensees are "bound to the standard of ordinary care" Della Monica v. Hottel, No. 23131, 2004 WL 1161414, at *2 (Va. Cir. Ct. May 24, 2004), and any failure to conform to that standard results in a breach of contract claim as "[a] brokerage relationship is a contractual relationship . . . [because] [t]he common law of agency relative to real estate brokerage relationship[s] has been expressly abrogated." Foster, 2010 WL 11020447 at *3.

In the Purchase Agreement, Norhurst is identified as the "Seller" and "WILKINS & CO. REALTORS – HAMPTON WILKINS" as Norhurst's "Listing Broker" who "represents Seller."  (Doc. 36-5 at 1.)  RE Prospects is denominated the "Purchaser," and "WILKINS & COMPANY JAMES BUCKNER" its "Selling Broker" who "represents [] Purchaser."  (Id.)[9]  The Purchase Agreement also expressly confirms

_____

[9] A "selling broker" is an agent for the buyer.  S.L. Nusbaum Realty Co. v. Centillion Corp., No. (Law) L97-100, 1995 WL 17049610, at *3 (Va. Cir. Ct. June 23, 1995).  A "listing agent" represents the interests of the seller.  Allen v. Lindstrom, 379 S.E.2d 450, 497 (Va. 1989); see also Barlow Burke, Law of Real Estate Brokers § 1.05 (4th ed. 2021) (explaining "[a] listing broker, as such, does not deal with prospective purchasers," but "the selling broker serves to introduce the purchaser to the vendor".  The Amended complaint confirms this understanding. (Doc. 36 at ¶ 58 n.3.) ("Mr. Buckner represented himself in the Purchase Agreement as working for a company, Wilkins & Company, which was the Selling Broker representing the Purchaser.").

that "the parties further acknowledge that disclosure of the brokerage relationships was made to them by the real estate licensees involved in this transaction when specific assistance was first rendered and confirmed in writing." (Id.)  The Purchase Agreement makes clear that Buckner's principal was RE Prospects, not Norhurst.  There is no indication that Buckner, the purchaser's representative, owed any duty to Norhurst, the seller.  Rather, an agent owes a fiduciary duty only to his or her principal.  Augusta Mut. Ins. Co. v. Mason, 645 S.E.2d 290, 294-95 (Va. 2007); cf. Baehr v. Creig Northrop Team, P.C., 953 F.3d 244, 256 (4th Cir. 2020) (analyzing Maryland law and noting "[p]ut succinctly, in a real estate transaction, a seller's representative does not owe fiduciary duties to the buyer.").

Norhurst argues that Buckner could not be RE Prospect's agent, prior to July 8, 2019, because the entity was not incorporated until then.  (Doc. 42 at 3.)  However, the question is whether Buckner, as purchaser's representative, could be said to be acting also for the seller, Norhurst.  Even if Buckner's client were a prospective one, it would still not render Buckner an agent for Norhurst.  As Norhurst was not Buckner's principal, Buckner was not Norhurst's agent and could not have owed it a fiduciary duty.

Next, Norhurst argues that Buckner owed it a fiduciary duty because both Wilkins and Buckner were employed by Wilkins Realty. This contention is unpersuasive.  The amended complaint clearly

23

alleges that Plaintiffs believed that Buckner was representing a potential <u>purchaser</u>.  (Doc. 36 at ¶ 58.)  Plaintiffs allege that on July 2, 2019, Wilkins texted Norton, disclosing that one of Wilkins Realty's agents had a "client" interested in the Property, asking: "Tim, is it possible to show your building lunchtime today?  Or lunchtime tomorrow?  <u>James Buckner has a client</u> and <u>the client</u> has requested confidentiality."  (Doc. 36 at ¶ 35 (emphasis added).)  Plaintiffs further allege that Wilkins "suggested that <u>Mr. Buckner's client</u> was a legitimate prospect," and that "Norton began negotiating a deal with <u>Mr. Buckner's new client</u> to buy the Property."  (<u>Id.</u> at ¶¶ 35, 43 (emphases added).)  Plaintiffs conclude that because Buckner "represented himself as working for both Wilkins Realty, as well as affiliated entity named Wilkins & Company," "he led Mr. Norton to believe that he was representing Mr. Norton's best interests because he was an agent of Wilkins Realty, the company working as Norhurst's (seller's) agent."  (<u>Id.</u> at ¶ 37.)  Consequently, Plaintiffs allege, Norton "began negotiating a deal with Mr. Buckner's new client."  (<u>Id.</u> at ¶ 43.)

     Norhurst's conclusory allegation that he believed Buckner was working in his best interests does not give rise to a fiduciary duty.  Norhurst's allegations make clear that it believed Buckner was presenting a "client" of his as a potential "purchaser."  Moreover, the Purchase Agreement expressly identifies Buckner as representing the "Purchaser."  (Doc. 36-5 at 1.)  Real estate

relationships in Virginia are <u>contractual</u> relationships, and the duties owed by agents to their principals are statutory.  <u>Foster v. Wintergreen Real Estate Co</u>, No. CL09000086, 2010 WL 11020447, at *3 (Va. Cir. Ct. Nov. 16, 2010) (amended upon reconsideration of other grounds).  The only executed agreement between Plaintiffs and Buckner was the Purchase Agreement, which lists Buckner in an adversarial position as buyer's representative.  As buyer's representative, Buckner owed no fiduciary duty to Norhurst.

Nor can it be said that Buckner was acting as a dual agent. There is no contractual relationship between Norhurst and Buckner. To the extent Norhurst's position rests on the contention that Wilkins Realty was acting as an undisclosed dual representative, while that may have implications for Wilkins Realty, it would not make Buckner a seller's agent.[10]

Buckner's motion to dismiss Count II will therefore be granted.

### 3.  Fraud claim

Count III claims that Buckner fraudulently represented that the prospective purchaser was an "out-of-town corporate client" in order to deceive Norhurst into signing the non-disclosure agreement with the intent to frustrate any deal between Norhurst and the City.  (Doc. 36 at ¶¶ 147-158.)  Buckner moves to dismiss

---

[10] Even were Buckner considered a dual representative, Norhurst's claim would fail for the reasons set out in part D <u>infra</u>.

Count III, arguing (1) the amended complaint fails to show that Buckner's representation was false, (2) the identity of the buyer was immaterial to Norhurst's decision to sell, (3) there is no relationship between Buckner and Norhurst requiring disclosure, (4) Norhurst fails to establish it reasonably relied on Buckner's statements, and (5) Norhurst fails to plead facts to establish it was damaged by the alleged fraud.  (Doc. 29 at 6-8.)

To plausibly plead a claim of fraud in Virginia, Norhurst must allege "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." Evaluation Rsch. Corp. v. Alequin, 439 S.E.2d 387, 390 (Va. 1994).  According to the amended complaint, RE Prospects is in fact a Delaware limited liability company (Doc. 36 at ¶ 6), and thus the representation that Buckner's client was an "out-of-town corporation" (id. at ¶ 151) was not materially false. Plaintiffs further allege that RE Prospects had yet to be incorporated when this representation was made.  (Id. at ¶ 44 n.2.) Assuming that to be true, then the false representation was that the "out-of-town corporate client" (id. at ¶ 151) had yet to be formed, which could not have been material to Plaintiffs' claim, as the essence of the allegedly false representation was the fact that the entity was "out-of-town" and thus by implication not the City.

26

Moreover, in May 2019, Wilkins Realty notified Norton that the DPD was interested in purchasing the property.  (Id. at ¶ 23.) On July 1, however, Wilkins contacted Norton to inform him the DPD was no longer interested in the Property.  (Id. at ¶ 33.)  At that time, the amended complaint alleges, Norhurst was "left with few options to sell the Property."  (Id. at ¶ 34.)  The lack of options to sell the Property was remedied on July 2 by Buckner, who informed Norton that he had a client who wanted to view the Property but desired to remain confidential.  (Id. at ¶ 35.) Buckner's representations cannot have been material as a matter of law.  Nowhere does the amended complaint plausibly allege that had Buckner not entered the picture, the City would have entertained any further negotiation with Norhurst.  To the contrary, the pleading alleges that after Norton chased off City officials from their walking the Property on June 20, 2019, the City did not want to have anything to do with him.  (Id. at ¶ 30.)[11]

According to the amended complaint, the ultimate identity of Buckner's client was of such little import to the sale of the Property that Norhurst agreed not only to move forward with the deal without knowing the buyer's identity but to agree to a non-

_____

[11] Norhurst contends that "[a]t the time Buckner presented his out-of-town corporate client, [Norhurst], via [its] agent Wilkins Realty, was actively engaged in negotiation with DPD over the sale of the property." (Doc. 42 at 6.)  However, Norhurst's amended complaint alleges that DPD had already expressed by then that it was no longer interested in the Property.  (Doc. 36 at ¶¶ 33, 35.)

disclosure agreement which forbade him from investigating the client's identity. (Id. at ¶ 40.) Additionally, the parties purposefully modified the standard Virginia REALTORS® form purchase agreement to include a provision allowing for the "assign[ment] [of the Purchase Agreement] by one party without the written consent of the other party." (Doc. 36-5 at 6.) Whatever import Plaintiffs contend to have placed on the identity of the purchaser cannot be claimed in light of these contractual waivers.

Moreover, even if the identity of the purchaser had been material, failing to disclose it would not constitute fraud. Concealment of a material fact may constitute fraud where a "legal obligation, or some fiduciary or confidential relationship . . . between the parties giv[es] rise to a duty to disclose." W. Cap. Partners, LLC v. Allegiance Title & Escrow, 520 F. Supp. 2d 777, 782 (E.D. Va. 2007) (citing Mountain Venture P'ship v. Town of Lovettsville, No. 18525, 1997 WL 1070433, at *10 (Va. Cir. Ct. Oct. 14, 1997) (unreported opinion) (citing cases)). "Under Virginia law, 'silence cannot give rise to liability for fraud in the absence of a duty of disclosure.'" IntraComm, Inc. v. Bajaj, No. 05-0955, 2006 WL 4535991, at *5 (E.D. Va. Apr. 19, 2006) (quoting Sabet v. E. Va. Med. Auth., 775 F.2d 1266, 1270 (4th Cir. 1984)). "[A] contract between sophisticated commercial parties transacting at arm's length generally does not create a fiduciary duty under Virginia state law." Mueller v. Thomas, 84 F. App'x

273, 275 (4th Cir. 2003).[12]  However, there are two exceptions to this general rule, "[a] duty [to disclose] may arise (1) if the fact is material and the one concealing has superior knowledge and knows the other is acting upon the assumption that the fact does not exist; or (2) if one party takes actions which divert the other party from making prudent investigations."  Bank of Montreal v. Signet Bank, 193 F.3d 818, 829 (4th Cir. 1999) (internal citations omitted).  Neither exception applies here.  Norhurst freely signed the non-disclosure agreement, voluntarily agreeing not to disclose the identity of Buckner's client (and further agreed to permit the buyer to freely assign the Purchase Agreement to anyone), and the amended complaint fails to allege that it was because of this failure that Norhurst sold the Property to RE Prospects.  There is no plausible allegation that Norhurst chose to sell the Property only because of his belief that Buckner's client was an out-of-town corporation.  Norhurst had previously attempted to sell the Property to DPD, and when that deal fell through, it "was left with few options to sell the Property."  (Doc. 36 at ¶ 34.) Norhurst alleges it accepted the next best opportunity, even though a non-disclosure agreement was required.  As such, Buckner's motion to dismiss as to Count III will be granted.

---

[12] While the Fourth Circuit does not ordinarily accord precedential value to its unpublished opinions, it has noted that they "are entitled only to the weight they generate by the persuasiveness of their reasoning." See Collins v. Pond Creek Mining Co., 468 F.3d 213, 219 (4th Cir. 2006) (citation omitted).

### 4.   Civil conspiracy claim

Finally, as to Buckner, Count V of the amended complaint alleges that he, in concert with Wilkins Realty, Walker, RE Prospects, and Schoolfield, conspired to purchase the Property at a discounted price from Norhurst and thereafter "flip the Property, using a similar lease-purchase concept." (Id. at ¶ 170.) Buckner moves to dismiss this claim, arguing that he "lawfully pursued a legitimate business objective, namely representing his client in negotiations for the purchase of [the] [P]roperty." (Doc. 29 at 9.)

"A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means." Hechler Chevrolet, Inc. v. Gen. Motors Corp., 337 S.E.2d 744, 748 (Va. 1985).  To recover for an action for civil conspiracy, a plaintiff must establish: "(1) a combination of two or more persons for the purpose of willfully and maliciously injuring plaintiff in his business[;] and (2) resulting damage to the plaintiff." Allen Realty Corp. v. Holbert, 318 S.E.2d 592, 596 (Va. 1984).  The plaintiff need not prove actual malice, but rather "a plaintiff must establish by clear and convincing evidence only that the conspirators acted with legal malice, i.e., 'intentionally, purposely, and without lawful justification.'" Dunlap v. Cottman Transmission Sys., LLC,

754 S.E.2d 313, 317 (Va. 2014) (quoting Com. Bus. Sys., Inc. v. BellSouth Servs., 453 S.E.2d 261, 267 (Va. 1995)). In Virginia, "a common law claim of civil conspiracy generally requires proof that the underlying tort was committed." Almy v. Grisham, 639 S.E.2d 182, 188 (Va. 2007). "The gist of the civil action of conspiracy is the damage caused by the acts committed in pursuance of the formed conspiracy and not the mere combination of two or more persons to accomplish an unlawful purpose or use and unlawful means." CaterCorp, Inc. v. Catering Concepts, Inc., 431 S.E.2d 277, 281-82 (Va. 1993) (quoting Gallop v. Sharp, 19 S.E.2d 84, 86 (Va. 1942)).

As Buckner owed no fiduciary duty to Norhurst, there is no breach. As there is no breach, there is no underlying tort. And as there is no underlying tort, there is no plausible claim of civil conspiracy against Buckner. See Almy, 639 S.E.2d at 188. Further, even if there were an underlying tort, Norhurst's amended complaint fails to plead that the conspirators acted with the requisite mental state - intentionally, purposely, and without lawful justification, and that the injury alleged was "at least one of the purposes of the conspiracy." Schlegel v. Bank of America, N.A., 505 F. Supp. 2d 321, 326 (W.D. Va. 2007) (citing Simmons v. Miller, 544 S.E.2d 666, 676-77 (Va. 2001)).

Norhurst argues that Walker hired Buckner "solely for an unlawful reason," which was to force "Norhurst to sell [its]

property at an unconscionably discounted amount." (Doc. 42 at 9.) However, Norhurst bases this conclusion on its assertion that "Buckner had little or no experience in multi-million-dollar commercial property transactions and the only plausible reason that someone with such lack of experience . . . would be trusted as a buyer's agent" is because Buckner could "obtain inside information from the City Council and had connections to influence the City Council." (Id.) However, "[l]egal malice" requires a showing "that the defendant acted intentionally, purposefully, and without lawful justification" to injure Norhurst. Simmons v. Miller, 544 S.E.2d 666, 677 (Va. 2001).

Norhurst alleges and argues that Walker used Buckner to "obtain the connections necessary to cause issues with the waterline at the Property," but Plaintiffs allege that those issues were already afflicting the Property before Buckner became involved in the sale. (Doc. 42 at 9); (See Doc. 36 at ¶ 21 ("At the time the Property was listed, Mr. Norton notified Wilkins Realty . . . [about] the underlying issues over a water supply line and shared easement.")). Moreover, Norhurst had a responsibility under the Purchase Agreement to disclose the water issue with the City (Doc. 26-5 at 3) (which it apparently did not), and of course the issue would have been discovered during the due diligence period before closing. Furthermore, the portion of the amended complaint which Norhurst cites to argue that Buckner aided

Walker in his "scheme to defraud" includes no assertions about Buckner.  Those paragraphs make no mention of any action by Buckner, except his seeking an extension of the closing date of the Purchase Agreement, to which Norhurst agreed.  (Doc. 36 at ¶ 89.)  Otherwise, it was Walker who communicated with City officials, scheduled walkthroughs for members of DPD, inquired about the water issue, and updated the City officials about the negotiations with Norhurst.  (Id. at ¶¶ 90-101.)  Because there is no underlying tort and the amended complaint does not allege that Buckner acted without lawful justification to injure Norhurst, Buckner's motion to dismiss will be granted.

   **C.   Walker, RE Prospects, & Schoolfield's Motion to Dismiss**

   Defendants Walker, RE Prospects, and Schoolfield (collectively the "Walker Defendants") move to dismiss Norhurst's claims against them.  (Doc. 30.)  Norhurst has responded in opposition.  (Doc. 40.)  The court will first address the Walker Defendants' motion as it relates to Count IV (fraud) and Count V (civil conspiracy) before analyzing Count I (rescission against Schoolfield).

   **1.   Fraud claim against the Walker Defendants**

   As noted, a plausible fraud claim in Virginia requires allegations of "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the

party misled." <u>Evaluation Rsch. Corp. v. Alequin</u>, 439 S.E.2d 387, 390 (Va. 1994).

The crux of Norhurst's fraud claim against the Walker Defendants is the same as its claim against Buckner: namely, that prior to the Property closing, the Walker Defendants concealed the identity of the true purchaser and induced Norton into signing the non-disclosure agreement to sell the Property at a discounted rate. (Doc. 36 at ¶¶ 159-65; Doc. 40 at 12.)  For similar reasons, Norhurst's fraud claim against the Walker Defendants must be dismissed.

While the identity of the buyer could not have been material to Norhurst given Norton's voluntary assent to the non-disclosure agreement as well as Norhurst's agreement that the buyer could unilaterally assign its interest in the Purchase Agreement to anyone it chose (Doc. 26-5 at 6), concealment of that fact would give rise to a fraud claim only where a "legal obligation or some fiduciary or confidential relationship . . . between the parties giv[es] rise to a duty to disclose." <u>W. Cap. Partners, LLC v. Allegiance Title & Escrow, Inc.</u>, 520 F. Supp. 2d 777, 782 (E.D. Va. 2007) (citing <u>Mountain Venture P'ship v. Town of Lovettsville</u>, No. 18525, 1997 WL 1070433, at *10 (Va. Cir. Ct. Oct. 14, 1997) (unreported opinion) (citing cases)); <u>see</u> <u>IntraComm, Inc. v. Bajaj</u>, No. 05-0955, 2006 WL 4535991, at *5 (E.D. Va. Apr. 19, 2006) ("Under Virginia law, 'silence cannot give rise to liability for

fraud in the absence of a duty of disclosure.'" (quoting <u>Sabet v. E. Va. Med. Auth.</u>, 775 F.2d 1266, 1270 (4th Cir. 1984))).  The Walker Defendants, as purchasers in an arms-length business transaction, owed no fiduciary duty or legal obligation to Norhurst as the seller.  Accordingly, there can be no claim of fraud for concealment of the buyer's identity.

As Norhurst points out, and as with the claims involving Buckner, there are two exceptions to this rule.  (Doc. 40 at 11.) Despite the absence of a duty to disclose in a business transaction, "[a] duty may arise (1) if the fact is material and the one concealing has superior knowledge and knows the other is acting upon the assumption that the fact does not exist; or (2) if one party takes actions which divert the other party from making prudent investigations."  <u>Bank of Montreal v. Signet Bank</u>, 193 F.3d 818, 829 (4th Cir. 1999) (internal citations omitted).  The materiality of the identity of the buyer is belied by Norton's assent to the non-disclosure agreement and the negotiated provision in the Purchase Agreement allowing for unilateral assignment of the agreement to anyone, which would include the City and the DPD.  Moreover, there are no allegations in the amended complaint that the Walker Defendants took any action to divert Norhurst from investigating the identity of the owner except for the non-disclosure agreement, into which Norton freely

entered.[13]

Because the Walker Defendants as buyers had no duty to disclose to Norhurst, Norhurst's claim of fraud will be dismissed.

### 2. Civil conspiracy claim against the Walker Defendants

Count V of the amended complaint alleges the Walker Defendants, in concert with Buckner and Wilkins Realty, conspired to induce Norhurst to sell the Property at a discounted rate. (Doc. 36 at ¶¶ 166-185.)  As noted in relation to Buckner's motion to dismiss, to recover for an action for civil conspiracy, a plaintiff must establish: "(1) a combination of two or more persons for the purpose of willfully and maliciously injuring plaintiff in his business[;] and (2) resulting damage to the plaintiff." Allen Realty Corp. v. Holbert, 318 S.E.2d 592, 596 (Va. 1984).  In Virginia, "a common law claim of civil conspiracy generally requires proof that the underlying tort was committed." Almy v. Grisham, 639 S.E.2d 182, 188 (Va. 2007).

As the court has found that there is no claim that the Walker Defendants fraudulently induce Norhurst to sell the Property, there is no underlying tort.  As there is no underlying tort, there

---

[13] Throughout the amended complaint, Norhurst characterizes RE Prospects and Schoolfield as "sham" entities.  (Doc. 36 at ¶¶ 143-45, 156-57, 172, 174.)  However, as Plaintiffs' counsel conceded at oral argument, there is nothing improper about businesses operating through limited liability companies, and in fact Norton proceeded in the same fashion when he established Norhurst and transferred the Property to it to serve as seller.  (Id. at ¶ 15.)

is no plausible claim of civil conspiracy against the Walker
Defendants. See Almy, 639 S.E.2d at 188. Therefore, the Walker
Defendants' motion to dismiss Count V of the amended complaint
will be granted.

### 3.   Rescission claim against Schoolfield

Count I of the amended complaint seeks rescission of the
Purchase Agreement against Schoolfield. (Doc. 36 at ¶¶ 124-132.)
According to Norhurst, Norton is entitled to rescind the Purchase
Agreement because of Defendants' misrepresentations and because
Norhurst "is willing and able to contribute towards the restoration
of the parties to the status quo ante." (Id. at ¶ 131.)

Rescission "calls for the highest and most drastic exercise
of power of a court of chancery -- to annul and set at naught the
solemn contracts of parties." Schmidt v. Household Fin. Corp.,
II, 661 S.E.2d 834, 837 (Va. 2008) (quoting Bonsal v. Camp, 69
S.E. 978, 979 (Va. 1911)). To succeed on a claim for rescission
under Virginia law, a plaintiff must first provide "a sufficient
averment of facts showing the plaintiff [is] entitled in equity to
the relief which he seeks, and satisfactory proof of these facts."
Young-Allen v. Bank of America, N.A., 839 S.E.2d 897, 900 (Va.
2020) (quoting Schmidt, 661 S.E.2d at 837). Finally, "the court
must be able substantially to restore the parties to the position
which they occupied before they entered into the contract." Id.
If an existing condition prevents restoration of the parties to

their status before the agreement was entered, "rescission will be refused." Orsi v. Kirkwood, No. 2:91cv744, 1992 WL 511406, at *5 (E.D. Va. Apr. 14, 1992) (citing Rafferty v. Heath, 78 S.E. 641, 642 (Va. 1913)); see McLeskey v. Ocean Park Invs., Ltd., 405 S.E.2d 846, 846 (Va. 1991) (noting rescission is only possible where the parties can "be restored to the status quo" prior to the making of the agreement).

Here, even had Norhurst alleged sufficient facts, it is impossible for the court to return the parties to their pre-sale positions. The parties entered the Purchase Agreement nearly three years ago, and the Property was sold well-over two years ago. (Doc. 36 at ¶ 122; Doc. 36-5 at 1.)  In the time that has since elapsed,[14] the Property has undergone extensive renovation, including nearly $6 million of upfit and thousands of hours of labor. (Doc. 51 at 24:7-17.)  The amended complaint confirms that funds from the City have already been paid for "the upfront cost of upfitting the Property for its new use." (Doc. 36 at ¶ 79.)

---

[14] Schoolfield also asserts the affirmative defense of laches. (Doc. 31 at 24.)  A motion to dismiss generally cannot reach the merits of an affirmative defense. Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007).  While the court need not reach this defense, what can be said is that Norhurst's substantial delay in bringing its claims resulted in the City entering into a fundamentally different lease arrangement with Schoolfield.  To grant Norhurst's request to rescind its sale of the Property to Schoolfield and to place Norquist in the shoes of Schoolfield's materially different lease arrangement with the City, which would require Norhurst to upfit the Property at a cost of millions of dollars (which Norhurst has made no indication of doing), finds no support in the law of rescission.

The court cannot possibly restore the parties to their pre-contract positions.   What Norhurst seeks is to step into the shoes of a materially different agreement.   That is not rescission. Schoolfield's motion to dismiss will therefore be granted.

D.   **Wilkins Realty's Motion to Dismiss**

Norhurst brings claims of breach of fiduciary duty and civil conspiracy against Wilkins Realty.   Wilkins Realty moves to dismiss these claims.   (Doc. 32.)   For the reasons that follow, Wilkins Realty's motion will be granted.

1.   **Breach of fiduciary duty claim**

Count II of the amended complaint alleges that Wilkins Realty breached a fiduciary duty owed to Norhurst because Wilkins Realty's agent, Buckner, misrepresented the identity of his client.   (Doc. 36 at ¶¶ 133-146.)   Norhurst also contends that Wilkins Realty breached its "duty to exercise the utmost fidelity" and to disclose all facts material to a transaction because of Buckner's misrepresentations and failure to inform Norhurst.   (Id. at ¶¶ 134-40.)

As noted, under Virginia law a breach of fiduciary duty claim requires that a plaintiff "allege enough facts to prove the existence of a fiduciary duty, (2) the breach of that duty, and (3) resulting damages." Broadhead v. Watterson, No. 5:15-cv-00020, 2016 WL 742127, at *6 (W.D. Va. Feb. 24, 2016) (citing Carstensen v. Chrisland Corp., 442 S.E.2d 660, 666-67 (Va. 1994)).

Virginia Code § 54.1-2131 requires brokers to "[p]erform in accordance with the terms of the brokerage agreement," and "[e]xercise ordinary care."  "[I]n adopting statutory guidelines for the conduct of realtors, the General Assembly has provided that '[t]he common law of agency relative to brokerage relationships in real estate transactions to the extent inconsistent with this article shall be expressly abrogated.'" Polyzos v. Cotrupi, 563 S.E.2d 775, 778 (Va. 2002) (quoting Va. Code § 54.1-2144).

Litigants in Virginia cannot assert tort claims that arise out of contractual duties.  Station # 2, LLC v. Lynch, 695 S.E.2d 537, 540 (Va. 2010).  Because the Virginia General Assembly has abrogated the common law of agency with respect to brokers, "[a] brokerage relationship is a contractual relationship under Va. Code § 54.1-2130."  Foster v. Wintergreen Real Estate Co, No. CL09000086, 2010 WL 11020447, at *3 (Va. Cir. Ct. Nov. 16, 2010) (amended upon reconsideration of other grounds).  An omission "which, without proof of a contract to do what was left undone, would not give rise to any cause of action (because no duty apart from contract to do what is complained of exits) then the action is founded upon contract, and not upon tort." Oleyar v. Kerr, 225 S.E.2d 398, 399 (Va. 1976).  As the common law of agency related to brokerage relationships is abrogated in Virginia, any fiduciary duty allegedly breached in this case existed solely because of the

contractual relationship between Norhurst and Wilkins Realty. Augusta Mut. Ins. Co. v. Mason, 645 S.E.2d 290, 295 (Va. 2007). Norhurst's breach of fiduciary duty claim is therefore properly considered as one claim for breach of contract.  But Norhurst makes no such claim.

Norhurst argues that "a party can, in certain circumstances, show both a breach of contract and a tortious breach of duty." (Doc. 41 at 4 n.1 (quoting Pre-Fab Steel Erectors, Inc. v. Stephens, No. 6:08-cv-00039, 2009 WL 891828 (W.D. Va. Apr. 1, 2009).)  That is true, but to do so the duty "breached must be a common law duty, not one existing between the parties solely by virtue of the contract." Richmond Metro. Auth. V. McDevitt Street Bovis, Inc., 507 S.E.2d 344, 347 (Va. 1998) (quoting Foreign Mission Bd. v. Wade, 409 S.E.2d 144, 148 (Va. 1991)).  Because Virginia law has abrogated the common law in brokerage relationships, brokers in Virginia have no common law duty owed to their clients.  Therefore, the proper claim is one for breach of contract.  Because no such claim is alleged, Count II against Wilkins Realty will therefore be dismissed.  Station #2, LLC, 695 S.E.2d at 540.

Plaintiffs nevertheless devote a substantial portion of their briefing to the contention that Wilkins Realty's role representing seller and buyer, through separate agents, respectively, constituted a breach of duty to Norhurst.  Though this contention

fails where common law duties are abrogated under Virginia law, because of the weight Plaintiffs appear to place on this contention, the court addresses why it would otherwise fail to state a claim.

Norhurst argues that its claim against Wilkins Realty arises "through the actions of its agent Buckner." (Doc. 41 at 4.) As discussed in relation to Buckner's motion to dismiss, the Purchase Agreement makes clear that Buckner, while denominated with Wilkins Realty as "Selling Broker," was further denominated as, and acting the capacity of, the representative of the "Purchaser." (Doc. 36-5.) As a representative of the purchaser, he owed no duty to Norhurst, the seller. Augusta Mut. Ins. Co., 645 S.E.2d at 294-95.

Although the amended complaint makes no such claim, Norhurst argues that the Defendants failed to properly disclose and obtain written consent as to Wilkins Realty's dual representation of purchaser and seller. (Doc. 41 at 5-7.) As Defendants point out, this contention fails. (Doc. 45 at 4-6.)

To the extent Wilkins Realty served as the Selling Broker for Norhurst and the purchaser's representative for RE Prospects, that dual representation is permitted under Virginia Code § 54.1-2139.01, and that dual representation was disclosed in the Purchase Agreement. (Doc. 36-5.)

Both brokers and real estate salespersons must be licensed to

engage in a real estate transaction.  Va. Code § 54.1-2106.1B-C.

Virginia law permits a licensee to act as a dual agent in a

commercial real estate transaction "only with the written consent

of all clients to the transaction."  Va. Code § 54.1-2139.01A.[15]

"A dual agent has an agency relationship under the brokerage

agreements with the clients."  Id.  "A dual representative has an

independent contractor relationship under the brokerage agreements

with the clients."  (Id.)  Written consent and disclosure of the

brokerage relationship is presumed to have been given as against

any client who signs a disclosure as provided by Virginia law.

Id.  That disclosure "may be given in combination with other

disclosures or provided with other information, but if so, the

disclosure shall be conspicuous, printed in bold lettering, all

capitals, underlined, or within a separate box."  Id. § 54.1-

2139.01B.  Virginia Code § 54.1-2139.01B also includes an example

of a compliant disclosure, although "[a]ny disclosure which

complies substantially in effect with the [example disclosure]

shall be deemed in compliance with this disclosure requirement."

Id.  For comparison, the example disclosure is provided below:

> DISCLOSURE OF DUAL AGENCY OR DUAL REPRESENTATION IN A
> COMMERCIAL REAL ESTATE TRANSACTION
>
> The undersigned do hereby acknowledge disclosure that:

---

[15] A "dual representative" is also authorized but is not relevant here.

43

The licensee _____ (name of broker or salesperson) associated with _____ (Brokerage Firm) represents more than one party in this commercial real estate transaction as follows:

Brokerage Firm represents the following party (select one):
[ ] Seller(s) [ ] Buyer(s) [ ] Landlord(s) [ ] Tenant(s)

As a (select one):
    [ ] agent [ ] independent contractor

Brokerage Firm represents another party (select one):

[ ] Seller(s) [ ] Buyer(s) [ ] Landlord(s) [ ] Tenant(s)

As a (select one):
    [ ] agent [ ] independent contractor

The undersigned understand that the foregoing dual agent or dual representative may not disclose to either client any information that has been given to the dual agent or representative by the other client within the confidence and trust of the brokerage relationship except for that information which is otherwise required or permitted by Article 3 (§ 54.1-2130 et seq.) of Chapter 21 of Title 54.1 of the Code of Virginia to be disclosed.

The undersigned by signing this notice do hereby acknowledge their informed consent to the disclosed dual representation by the licensee.

Id. In any transaction involving a licensee, the licensee "may withdraw, without liability, from representing a client who refuses to consent to a disclosed dual representation thereby terminating the brokerage relationship with such client." Id. at § 54.1-2139.01E. That withdrawal "shall not prejudice the ability of the licensee to continue to represent the other client in the transaction or to limit the licensee from representing the client

who refused the dual representation in other transactions not involving dual representation." Id.

Norhurst argues that Wilkins Realty operated in a dual representation relationship which was not adequately disclosed and, therefore, was never consented to. To be sure, there is no contention of an agreement between the parties containing a dual agency disclosure in the format provided by the statute.[16] However, disclosure need not replicate the statutory example. The statute provides that it need only "compl[y] substantially in effect" with it. Va. Code § 54.1-2139.01B. The parties have not identified, nor has the court found, any other court to have considered this statute or the meaning of "substantially in effect." Nor is it even clear that the statute provides a basis for a private cause of action.

Section 54.1-2139.01's disclosure requirement identifies two purposes. The first is to clearly delineate to the parties to a transaction which licensee (broker or salesperson) represents which party and in what capacity. The second is to inform the parties that the dual agent or representative "may not disclose to either client any information" given to the agent or representative by the other client within the confidence and trust of the

---

[16] Why that is so is not explained by any party even though the Listing Agreement and Purchase Agreement appear to be forms used by Virginia REALTORS®.

brokerage relationship "except information which is otherwise required or permitted" to be disclosed by Va. Code § 54.1-2130 <u>et seq</u>. <u>Id.</u>   <u>See, e.g.,</u> Va. Code § 54.1-2138.1 (requiring licensees to disclose whether the licensee is acting as a limited service agent in a residential real estate transaction; <u>id.</u> § 54.1-2138.2 (requiring disclosure if the licensee possesses an ownership interest in the subject real property).   None of those required disclosures is at issue in this case.

Here, the disclosures "complie[d] substantially in effect" with the first purpose of the statute.   Paragraph 14 of Norhurst's Listing Agreement with Wilkins Realty, which Norton acknowledged, provides:

> **14. WAIVER OF CONFLICT.** Owner hereby authorizes Broker to represent and serve as exclusive agent for any prospective purchaser of the Property or any part thereof, and Owner hereby waives any conflict of interest claim which might arise as a result thereof.

(Doc. 36-1 at ¶ 14.)   Disclosure of the dual representation was reiterated in the Purchase Agreement, which affirmed the broker relationship –– and which is set out in Plaintiffs' own amended complaint -- was sufficiently disclosed to the parties.   (Doc. 36-5 at 1; Doc. 36 at ¶ 59.)   Norton, on behalf of Norhurst, confirmed this when he signed the non-disclosure agreement with Buckner, who was acting as purchaser's representative.   (Doc. 36 at ¶ 40.) These make clear that Wilkins Realty served as the brokerage company for both parties, Wilkins represented Norhurst as "Listing

Broker," and Buckner represented RE Prospects as "Selling Broker." These disclosures "compl[y] substantially in effect" with the first purpose of the statutory example; namely, to clearly delineate the role of the dual agent or representative in relation to the parties.

The statutory disclosure's second purpose is to notify the parties that the dual agent is precluded from disclosing certain information given to the agent by the other client.  This, the Listing Agreement and Purchase Agreement do not do.  However, that is not the end of the inquiry.  That is because Norhurst fails to show any link between the lack of statutory disclosure and his claims.  Plaintiffs allege that Buckner clearly stated he could not disclose certain information about "the anonymous buyer or discuss any details regarding that anonymous buyer's potential purchase of the Property" and that Buckner confirmed that understanding in the non-disclosure agreement, which Norton signed.  (Id.)  Norhurst also agreed that the purchaser could assign the Purchase Agreement to anyone it chose.  The information that Norhurst contends should have been disclosed by Buckner was thus the very information Buckner told him the prospective buyer was unwilling to disclose.  Therefore, even had the required disclosure been made, Norhurst fails to allege how the disclosure would have altered his decision to sell.  In other words, Norhurst cannot claim that it would have rejected the alleged dual agency

47

relationship and declined the sale had he known there was information Buckner could not pass onto him, because Buckner told him that the purchaser was unwilling to disclose that information in any event. Norhurst's signing of the non-disclosure agreement only confirmed his understanding that the information would not be disclosed.

Norhurst's contention that he was induced into signing the non-disclosure agreement by Buckner's misrepresentations fails to revive this claim. As discussed previously, Buckner was acting as the purchaser's representative and owed no duty to the seller to disclose the matters complained of.

For these reasons, Norhurst's breach of fiduciary claim against Wilkins Realty (Count II) will be dismissed.

### 2.   Civil conspiracy

Count V of the amended complaint alleges that Wilkins Realty, in connection with the other Defendants, conspired to "injure Norhurst's business" by misrepresenting the identity of the purchaser and the intended purpose of the Property after purchase. (Doc. 36 at ¶¶ 166-85.) As noted, to recover for an action for civil conspiracy, a plaintiff must establish: "(1) a combination of two or more persons for the purpose of willfully and maliciously injuring plaintiff in his business[;] and (2) resulting damage to the plaintiff." Allen Realty Corp. v. Holbert, 318 S.E.2d 592, 596 (Va. 1984). In Virginia, "a common law claim of civil

conspiracy generally requires proof that the underlying tort was committed." Almy v. Grisham, 639 S.E.2d 182, 188 (Va. 2007).

Similar to the previously addressed motions, Count V against Wilkins Realty must be dismissed, as there is no underlying tort. "A claim of civil conspiracy is not actionable in its own right"; rather, the action will lie only if "the predicate unlawful act independently imposes liability upon the primary wrongdoer." La Bella Dona Skin Care Inc v. Belle Femme Enterprises, L.L.C., 805 S.E.2d 399, 406 (Va. 2017). As none of the alleged conspirators engaged in an actionable tort, Norhurst's civil conspiracy claim lacks a requisite underlying wrongdoing and must be dismissed. Therefore, Wilkins Realty's motion to dismiss Count V will be granted.

### E.   Amendment of the Amended Complaint

Plaintiffs argue that in the event the court finds deficiencies in the amended complaint, they be permitted to amend it to address them. (Doc. 40 at 23.) Plaintiffs have already amended the complaint once as a matter of right. (Doc. 36); Fed. R. Civ. P. 15(a)(1). Their current request for leave to amend, imbedded in their response brief to the Walker Defendants' motion to dismiss, is not accompanied by a motion, and Plaintiffs have not offered any proposed amended complaint.

Under Federal Rule of Civil Procedure 15(a)(2), once 21 days passes from service of a motion to dismiss, a plaintiff may amend

a pleading only with the opposing party's consent or leave of court.  Leave should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2).  However, a "request for the court must be made by a motion," which must state the grounds for seeking the order and state the relief sought.  Fed. R. Civ. P. 7(b)(1).  A request for leave to amend, in the event that any part of the complaint is dismissed, at the end of a plaintiffs' response brief opposing a motion to dismiss is not a proper motion for leave to amend; it would be proper for a district court to deny the request on these grounds alone.  See Cozzarelli v. Inspire Pharms. Inc., 549 F.3d 618, 630–31 (4th Cir. 2008).  Additionally, this district's local rules require parties to file a motion for the court for resolution of certain issues to ensure opposing parties have an opportunity to respond.  L.R. 11.  It is within the discretion of a district court to deny a motion for leave to amend where the moving party fails to comply with the local rules.  See United States ex rel. Rostholder v. Omnicare, Inc., 745 F.3d 694, 703 (4th Cir. 2014).

Plaintiffs were informed at the hearing on the present motions that their request to amend was improper.  (Doc. 51 at 62:25–63:6 (advising Plaintiffs that "a request in a memorandum is not a motion before the Court."))  Because Plaintiffs have not indicated how they would cure any defects or raise claims not brought, their request for leave to amend will be denied without prejudice as to

Wilkins Realty – the only party sued with whom Norhurst had a contract.[17]   Cf. United States ex rel. May v. Purdue Pharma L.P., 737 F.3d 908, 920 (4th Cir. 2013) (noting that dismissal with prejudice would be improper where amendment would not be futile or otherwise improper).

**III. CONCLUSION**

This case relies on abrogated legal theories and speculation. The parties' relationships were governed by their realty contracts, yet there is no claim for breach.  While Plaintiffs allege they were deceived by the Defendants into no longer negotiating with the City to sell the Property, there is absolutely no contention or factual allegation to render it plausible that the City would ever have accepted any offer by Plaintiffs.  Rather, the amended complaint alleges that Plaintiffs sold the Property to an out-of-state limited liability company in the business of developing the Property with millions of dollars of upfit and then leased that upfitted Property to tenants, including the City. Plaintiffs do not allege that they ever offered any such arrangement or contemplated doing so – rather, offering only an outright sale or lease, which the City allegedly rejected outright. Plaintiffs' claims that they would have sold or leased the Property to the City are at best speculative and certainly not plausible on

---

[17] By allowing dismissal without prejudice, the court expresses no view on whether any future claim would be cognizable.

51

the allegations of the amended complaint.  For the reasons stated, therefore,

IT IS ORDERED that Defendant Buckner's motion to dismiss (Doc. 28) is GRANTED and the amended complaint against him is DISMISSED.

IT IS FURTHER ORDERED that Defendants Edward Walker, RE Prospects, and Schoolfield's motion to dismiss (Doc. 30) is GRANTED and the amended complaint against them is DISMISSED.

IT IS FURTHER ORDERED that Defendant Wilkins & Co. Realty's motion to dismiss (Doc. 32) is GRANTED and the amended complaint against it is DISMISSED WITHOUT PREJUDICE.


　　　　　　　　　　　　　　　　　/s/   Thomas D. Schroeder
　　　　　　　　　　　　　　　　United States District Judge

August 2, 2022